### HUTCHINSON v. NORFOLK & W. RY. CO.

(Circuit Court of Appeals, Fourth Circuit. June 9, 1909.)

#### No. 862.

RAILROADS (§ 278*)—INJURY TO PERSONS WORKING ON SWITCH TRACK—NEGLIGENCE OF PERSON INJURED.

    Plaintiff's intestate and another, who were employés of a coal company, were engaged in mending a broken rail on a switch track extending from the main line of defendant's railroad to the coal mine, when a freight train approached on the main line, and a brakeman told the workmen that they wished to place some empty cars on the switch. Deceased and his companion left the track while three cars were backed on the switch, and the train again pulled onto the main track, when they again went to work; the deceased sitting on the track with his back toward the nearest car, which was only six feet away. The engine, having left some intermediate cars, shoved three more on the switch, which struck those left before and pushed them ahead and over the deceased, causing his death. Deceased and his companion, being immediately behind the standing cars, were not seen by the trainmen. *Held,* that such trainmen were not negligent, but that the injury resulted from the negligence of deceased in going back on the track without first learning whether more cars were to be switched or observing the movements of the train.

    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 891–900; Dec. Dig. § 278.*]

In Error to the Circuit Court of the United States for the Southern District of West Virginia, at Huntington.

---

This action was originally brought in the circuit court of Mingo county, W. Va., by the plaintiff in error against the defendant in error to recover damages in the sum of $10,000 for the alleged wrongful killing of W. C. Little, the intestate of the plaintiff. Subsequently, upon the petition of the defendant, the case was removed for trial into the Circuit Court of the United States for the Southern District of West Virginia. The declaration was in trespass on the case, alleging generally that intestate was killed through the negligence of the defendant by and through its servants and employés. The defendant entered a plea of not guilty, and thus the issue was raised. The case was tried at Huntington in April, 1908, and after all the evidence, both for the plaintiff and defendant, had been introduced, the defendant demurred to the plaintiff's evidence, in which demurrer the plaintiff joined. The case was permitted by the court to go to the jury, and a verdict was returned in favor of the plaintiff for $7,000 damages, subject, however, to the opinion of the court, thereafter to be rendered on the demurrer to the evidence. The court subsequently sustained the demurrer to the plaintiff's evidence and entered judgment in favor of the defendant. This action of the court constitutes the basis of plaintiff's exception and assignment of error upon which the case is before us for consideration.

### Statement of Facts.

The Camp Branch Coal Company operates a mine near the town of Dingess, in Mingo county, W. Va., which mine is located near the main line of the Norfolk & Western Railway Company, the defendant in this action. The defendant owns a spur track, called the "Camp Branch switch," extending from its main line to the mine of the coal company. The coal company, however, keeps the switch in repair. The defendant company, when requisitions were made, would place empty cars from its main line upon and along the switch, and when the cars were loaded with coal would then pull them out on the main line and transport them to market. The Camp Branch coal mine is situated on the right hand side going eastward of the defendant's railway, and the switch or spur connecting the tipple thereof with the main line runs eastward from the tipple along the main line approaching nearer until a connection is effected.

W. C. Little, the intestate of plaintiff, was employed by the Camp Branch Coal Company, and on the morning of July 1, 1901, between 6 and 7 o'clock, the day he was killed, was working together with a man by the name of Green, also employed by the coal company, engaged in repairing a rail on the switch. The rail had been broken, and Little and Green were drilling holes to put in fresh plates, or angle bars, as they are sometimes called, to mend it. While the two were thus engaged, a train of freight cars pulled up and stopped on the main line, and a brakeman standing on top of one of the freight cars in the train called out to the two men and asked how the track was, that they were going to put some empty cars in. Little replied: "A rail is broken, and the track is not fit to go over; but I think you can put empties in above." The train, which was composed of 25 or 30 cars, had 6 empty cars to shift onto the switch. These 6 cars, however, were not 'all together; 3 of them being at one place in the train, and then, after some other intervening cars, were the other 3. When Little and Green were notified that empties were to be placed on the switch, they quit work, gathered up their tools and left the track in order that the empty cars might be moved in. The train then backed in upon the switch and left three freight cars standing, the end of the last one within about six feet of the place where Little and Green had been working. It then pulled out again onto the main line, moved about, and dropped the cars of the train until the other three empties to be moved upon the switch were in position. The train then moved back onto the switch again and pushed the three remaining empties up against those that had theretofore been put upon the switch; the time elapsing between the placing of the first three upon the switch and when the train moved back with the other three being variously estimated by the witnesses at from 5 to 20 minutes. In the meantime Little and Green, immediately after the placing of the first three cars, without notice to the operators of the train, and without being seen by any of them, went back to work upon

the track. Green sat down with his face towards the rear end of the last car of the first three, and Little, the intestate, sat astride the rail with his back towards the standing cars, and within about six feet of the end of the one in the rear.

The operators of the train did not give any signals or notice that they were coming in on the switch the second time, and the conditions were such that those handling the train could not see Little and Green, nor could the latter see the moving cars on the switch from where they sat. The empty cars last moved in ran up against the three standing cars, and these were shoved back sufficiently far for the rear one to run over and crush Little so that his death ensued shortly thereafter. Green, who was sitting, as before stated, facing Little, escaped unhurt. The evidence in the case further shows that the point at which Little was sitting when he was killed is about 90 feet in a direct course from the main line of the defendant, and that there were cars which belonged to the train standing on the main line at this point of distance when the second three empty cars were moved onto the switch.

It may be stated further that Green, who was the principal witness for plaintiff as to what occurred at the time of the accident, upon cross-examination, was somewhat more explicit than on the direct. He said that Little and himself had a ratchet drilling a hole at the place the rail was broken when the freight train moved up on the main line and stopped, that the brakeman called out to know if the track was all right, and that Bill (meaning Little) replied, "It is for empties, but not for loads." He said, "You can put empties in, but you cannot take any loads out until this rail is mended." Green said further: "They put in three cars and pulled out on the main line, and we put our ratchet back on the rail when they pulled out. We thought that they were going and that the train was not coming in. They were on the main line switching around."

Lace Marcum and Marcum & Marcum, for plaintiff in error.

John H. Holt (Theodore W. Reath and Holt & Duncan, on the brief), for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and BOYD, District Judge.

BOYD, District Judge (after stating the facts as above). The action of the Circuit Court in sustaining the demurrer to the evidence was in effect to direct a verdict for defendant, or in other words, to hold that taking the testimony in support of plaintiff's declaration to be true, together with all reasonable inferences to be drawn therefrom, it was not sufficient in law to establish plaintiff's contention.

We see nothing in the evidence upon which a jury would be warranted in finding that the defendant was negligent. There was nothing unusual in the operation of the train on the occasion of the accident; but, on the other hand, the spur track, or "switch," as it was called, was being used by the defendant in the ordinary manner and for the purpose for which it was constructed and maintained. The intestate had ample notice of the presence of the train on the main line and the intention of the operators thereof to run in and upon the switch with empty cars to be left for the use of the coal company.

When the train stopped upon its arrival and notified intestate and Green that the empty cars were to be placed upon the switch, they picked up the tools with which they were at work, left the track clear until the first three empty cars were moved in, then without making any inquiry or investigation whatever to ascertain if the train was coming upon the switch again, or even looking to see if the train had depart-

ed, and in face of the fact, as stated by Green, that the train was still "switching around" on the main line, they went back onto the track, and intestate sat down within six feet of the end of the rear car which had been moved in, with his back toward the car, in which situation he could not see the train moving, nor could those operating the train see him, and this action on his part was immediately after the placing of the first three cars on the switch. We think that intestate not only failed to use the care and precaution under the circumstances which prudence would have dictated, but that his conduct was careless to a degree bordering on heedlessness. This in our opinion was the sole cause of his death.

As we have stated, intestate went back upon the track and practically concealed himself from the operators of the train without any notice whatever to them that he was there. He did not know the number of empty cars that were to be placed upon the switch, and it was therefore his duty to wait at least a reasonable time in a place of safety and find out if more cars were to come in, especially in view of the fact that, as testified by Green, the train was still engaged in switching on the main line. If intestate had used his senses of sight and hearing, he could have known what was going on. The action of both Green and intestate is probably explained by Green's testimony, in which he says, "We thought the train had gone." · It was not enough, however, to merely think, nor to act upon the thought; but the further duty devolved upon intestate under conditions of apparent danger to look and see, and if he had done this he would have discovered that the train was still there, was in motion, and was proceeding to use the switch again.

We conclude therefore that there was no error in the judgment of the Circuit Court sustaining defendant's demurrer to the evidence, and the judgment is therefore affirmed.

Affirmed.